# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| S.U.,<br><br>Plaintiff,<br><br>v.<br><br>STOCKTON UNIVERSITY, STOCKTON UNIVERSITY EMERGENCY MEDICAL SERVICES, WILLIAM MURPHY, PI KAPPA PHI, JOHN DOES (1-20), A-Z OWNER CORPORATIONS (1-20),<br><br>Defendants. | Civil No. 18-12145(RMB/JS)<br><br>**OPINION** |

**APPEARANCES:**

FUGGI LAW FIRM, P.C.
By: Robert R. Fuggi, Esq. Jonathan M. Penney, Esq.;
Peter S. Pascarella, Esq.
47 Main Street, P.O. Box 1808
Toms River, New Jersey 08754
    Counsel for Plaintiff S.U.

OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
By: Michael R. Sarno, Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 116
Trenton, New Jersey 08625
    Counsel for Defendants Stockton University and
    Stockton University Emergency Medical Services

GREENBAUM, ROWE, SMITH & DAVIS, LLP
By: John D. North, Esq.; Jemi Goulian Lucy, Esq.;
   Irene Hsieh, Esq.
P.O. Box 5600
Woodbridge, New Jersey 07095
    Counsel for Defendants Stockton University and
    Stockton University Emergency Medical Services

ZARWIN BAUM DEVITO KAPLAN SCHAER TODDY, P.C.
By: Timothy P. Mullin, Esq.
309 Fellowship Road, Suite 200
Mt. Laurel, New Jersey 08054
    Counsel for Defendant Pi Kappa Phi Fraternity, Inc.

**RENÉE MARIE BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiff S.U. ("Plaintiff") brings this action against Defendants Stockton University ("Stockton"), Stockton University Emergency Medical Services ("Stockton EMS"), William Murphy "Murphy"), and Pi Kappa Phi Fraternity, Inc. ("PKP") (collectively, "Defendants"), in relation to a series of alleged sexual assaults during Plaintiff's time as a student at Stockton. Specifically, Plaintiff alleges that she was sexually assaulted three times in September 2017: once by a "red headed male" at the local PKP fraternity house and twice by Defendant William Murphy in his Stockton campus housing.[1]

Plaintiff's Complaint (the "Complaint")[Dkt. No. 1] asserts causes of action under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq. (Counts 1-2), Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983 (Counts 3-4), the Jeanne

---

[1] This is the Court's third decision resolving various motions to dismiss in the nine related "Stockton cases" currently pending before this Court. This Court's Opinion contains some substantially similar reasoning to portions of the prior decisions issued in D.N. v. Stockton Univ., Civ. No. 18-11932 (RMB/JS), 2019 WL 2710500 (D.N.J. June 28, 2019), and D.D. v. Stockton Univ., Civ. No. 18-13506 (RMB/JS), 2019 WL 3369709 (D.N.J. July 26, 2019).

2

Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092 (Count 5),[2] personal injury tort claims (Counts 6-13), as well as various derivative claims (Counts 14-24).

This matter now comes before the Court upon Motions to Dismiss, filed by Stockton, Stockton EMS, and PKP (collectively, the "Moving Defendants")[See Dkt. Nos. 26, 27].[3] Although the Court accepts all of Plaintiff's disturbing allegations as true for purposes of these motions, the Court is constrained by legal precedent mandating dismissal. For the reasons set forth herein, the Moving Defendants' Motions to Dismiss will be **GRANTED**, and Plaintiff's claims against the Moving Defendants will be **DISMISSED WITHOUT PREJUDICE**. The Court, however, will allow Plaintiff thirty (30) days to file an amended complaint, addressing the deficiencies discussed in this Opinion.

I. **FACTUAL BACKGROUND**

In her Complaint, Plaintiff describes the grave details of the alleged sexual assaults. As averred, Plaintiff was a

---

[2] In response to Defendants' Motions to Dismiss, Plaintiff conceded that the Clery Act does not allow for a private cause of action and voluntarily withdrew Count 5 of the Complaint. See Plaintiff's Brief in Opposition to the Motions to Dismiss ("Pl.'s Opp. Br.")[Dkt. No. 35], at 52. Therefore, the Court will not address Plaintiff's Clery Act claim in this Opinion.

[3] The only Defendant who has not filed a Motion to Dismiss is William Murphy.

3

freshman at Stockton University in the fall of 2017, studying to become a trauma nurse. See Compl. at ¶ 4. On the night of September 7, 2017, Plaintiff alleges that she, along with some friends, attended a party at the PKP off-campus fraternity house. Id. at ¶ 13. After drinking two cans of beer, provided by PKP members, Plaintiff states that she suddenly "began to feel dizzy and was incapacitated and thereafter passed out." Id. at ¶ 18. Plaintiff describes "going in and out of consciousness" and "waking up in one of the bedrooms in the Pi Kappa Phi fraternity house with an unknown red headed male on top of her having sex with her." Id. at ¶¶ 19-20. Due to her incapacitated condition, Plaintiff "was unable to identify or know her assailant, or able to give consent." Id.

Plaintiff does not recall how she got out of the bedroom, but her next memory was sitting on the curb outside the PKP house, "crying because her vagina was in pain, which lead [sic] her to believe that she had been sexually assaulted [] when she was unconscious." Id. at ¶¶ 21-22. Plaintiff states that she finally regained her faculties when she was back at the Stockton University dorms, without any memory of how she got back to campus. Plaintiff recalls that "her left wrist and her vagina [were] still in a great deal of pain." See Compl. at ¶ 24. Upon returning to her dorm room, Plaintiff's roommates allegedly told

her "that she could not sleep in their dorm room because she was still incapacitated, emotional, and very upset." Id. at ¶ 25.

After being turned away by her roommates, Plaintiff "sought comfort and help from Defendant William Murphy, who was a friend and a member of the Stockton University E.M.S." See Compl. at 26. Murphy was a junior at Stockton and served as a Sergeant for the Stockton EMS, which Plaintiff was in the process of applying for a position as an EMT. Id. at ¶¶ 27-28. "Plaintiff asked Murphy if she could stay at his university housing for the night for safety and medical reasons." Id. at ¶ 29. Murphy picked up Plaintiff and drove her to his on-campus dorm. Id. at ¶ 30.

While at Murphy's dorm room, Plaintiff told Murphy "what had happened at the Pi Kappa Phi house that evening, explaining that she had consumed only two beers before falling unconscious and finding herself in a bedroom with a red headed male from Pi Kappa Phi that she didn't know on top of her." See Compl. at ¶ 31. Plaintiff told Murphy that "her vagina was very sore, and that she feared someone had sex with her while she was incapacitated." Id. In response, Murphy allegedly took out a bottle of Captain Morgan rum, poured shots, and encouraged Plaintiff, who was still drunk, to "calm down by having a few shots." Id. at ¶ 32.

Plaintiff states that the next thing she remembers was standing naked in Murphy's dormitory shower, with Murphy "standing in the shower naked next to her touching her sexually."

5

See Compl. at ¶ 34. Plaintiff explains that while she was still incapacitated, Murphy "sexually assaulted and raped S.U. just hours after she had been assaulted and raped at the Pi Kappa Phi fraternity house and was trying to recover." Id. at ¶ 35. The next morning, "Plaintiff woke up naked, with her vagina sore and in pain, in Defendant Murphy's bed, next to the Defendant who was naked as well." When questioned about what had happened the previous night, Murphy told the Plaintiff that she was "really drunk." Plaintiff states that she was "startled and upset" and hurried out of Murphy's campus apartment and headed to class.

After returning from her classes, Plaintiff "reported to her R.A. Diane Santos the sexual assault/rape that occurred at the Pi Kappa Phi fraternity house the night before." See Compl. at ¶ 39. In turn, Santos relayed Plaintiff's report to the Stockton's Office of Residential Life. Id. at ¶ 40. A woman from Residential Life "spoke to S.U. and inquired if she wished to file a police report with the Stockton Police," but Plaintiff "chose not to file criminal charges." Id. at ¶¶ 40-41. Although Plaintiff reported the alleged sexual assault by the unknown perpetrator at PKP, she did not report the alleged sexual assault by Murphy because "[a]t that moment in time, she was unaware, if Defendant Murphy had attempted to have sex with her while she was in an incapacitated state at his dorm." Id. at ¶ 39. Plaintiff

6

states that Stockton performed no further investigation into the reported sexual assault. Id. at 42.

The Residential Life officer asked Plaintiff if she wished to be brought to the hospital, to which Plaintiff answered affirmatively. See Compl. at ¶ 41. That evening, Plaintiff's friend transported her to Shore Medical Center in Somers Point, where a rape kit was completed. Id. at ¶¶ 43, 46. The rape kit showed "swelling, redness, and semen in [Plaintiff's] vagina," and Plaintiff was administered "emergent medications" to prevent pregnancy. Id. at ¶¶ 46-47.

While at the hospital, Plaintiff texted Murphy to notify him "that she was at the hospital because she had been raped." See Compl. at ¶ 44. According to Plaintiff, "Murphy became concerned that S.U. was reporting him for the rape." Id. at ¶ 45. The next day, Saturday, September 9, 2017, Murphy asked Plaintiff to come over to his apartment to discuss the events from the night of September 8, 2017. Id. at ¶ 48. Although Plaintiff states that she was anxious about meeting with Murphy again, she "wanted to find out what had occurred the night before." Id. at ¶ 49. Murphy picked Plaintiff up and drove her to his dorm, where he "attempted to dispel her worries and fears of having been sexually assaulted." Id. Plaintiff alleges that Murphy "once again provided Captain Morgan Rum to the Plaintiff which led to the Plaintiff becoming intoxicated and incapacitated." Id. at ¶

7

50. Plaintiff states that for the second time, "while incapacitated, Defendant Murphy again sexually assaulted and raped S.U." Id. at ¶ 51.

Upon returning to her dorm room, Plaintiff and her roommates "noticed significant bruises and marks all over [Plaintiff's] body" with "very deep, dark blue and dark reddish marks on her right lateral neck area, inferior to her throat/mandible areas, and on her left lateral neck areas." See Compl. at ¶¶ 52-53. There were also "marks in between her breasts and all over her body," which "varied in color[,] intensity, and in size." Id. at ¶¶ 53-54. Plaintiff states that the bruising was so severe that it lasted for two weeks, and "it was difficult to keep others from seeing them... especially her employer." Encouraged by her roommates, on Sunday, September 10, 2017, Plaintiff "returned to Shore Medical Center with the intention of reporting the second sexual assault/rape by Defendant Murphy and completing a second rape kit." However, after arriving at the hospital, Plaintiff discharged herself from the hospital, due to her "fear of dealing with the anxiety and panic of going through the same process she had endured two nights prior."

Later on September 10, 2017, Plaintiff texted Murphy and told him that "she knew he raped and sexually assaulted her." See Compl. at ¶ 58. Plaintiff states that Murphy initially "admitted it and was apologetic for leaving the marks and bruises." Id. at

8

¶ 59. However, when Plaintiff informed Murphy about the rape kit being completed, "he began to make abusive remarks and grew angry." Id. According to Plaintiff, "Murphy admitted that 'he was in love with S.U.' but he knew the feeling was not mutual as she viewed him more as a friend." Id. at ¶ 60. Murphy proceeded to make "nasty and downgrading [sic] remarks to the Plaintiff concerning her decision to become a paramedic instead of pursuing nursing school." Id. at ¶ 61. Plaintiff ultimately deemed it necessary to block Murphy's phone number and avoid all contact with him. Id. at ¶ 62.

Plaintiff explains that the traumatic sexual assaults took a serious toll on her mental health. As a result of the sexual assaults, Plaintiff became depressed and attempted suicide by overdosing on her medications in November 2017. See Compl. at ¶ 63. Ultimately, Plaintiff "was forced to leave Stockton University in December 2017 because of the traumatic events of dealing with the sexual assaults and rapes." Id. at ¶ 64. As of the time of this Complaint, Plaintiff was finishing her pre-requisite classes at her local community college with plans to apply to be an EMT/paramedic. Id. at ¶ 7.

On July 27, 2018, Plaintiff commenced this action against Defendants. Now, this matter comes before the Court upon motions to dismiss filed by the Stockton Defendants and PKP, who argue that Plaintiff has failed to state a claim.

## II. **LEGAL STANDARD**

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 662. "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. Id. at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

In reviewing a plaintiff's allegations, the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." Bistrian v. Levi, 696 F.3d 352, 358 n.1 (3d Cir. 2012). When undertaking this review, courts are limited to the allegations found in the complaint, exhibits attached to the

complaint, matters of public record, and undisputedly authentic documents that form the basis of a claim. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

In their respective motions to dismiss, the Moving Defendants set forth various arguments for dismissal. The Stockton Defendants argue that Plaintiff cannot maintain tort claims against Stockton because Plaintiff failed to serve notice under the New Jersey Tort Claims Act ("TCA"), and that Plaintiff fails to adequately allege Title IX and § 1983 claims. Additionally, both the Stockton Defendants and PKP argue that Plaintiff cannot pursue claims under a theory of vicarious liability or respondeat superior. Based on the manner in which the allegations are currently pled in the Complaint, the Court must rule in favor of the Moving Defendants.

### A. *Personal Injury Claims (Tort Claims Act)*

First, Stockton argues that Plaintiff's personal injury claims against the university must be dismissed for failure to meet the TCA's notice of claim requirement. The TCA imposes certain limitations on the tort liability of a New Jersey public entity and of a New Jersey public employee. See N.J.S.A. 59:1-2;

11

N.J.S.A. 59:2-1; N.J.S.A. 59:3-1. Of relevance to this action, the TCA precludes actions against a public entity or its employees when the plaintiff has failed to comply with its notice of claim provision. See Coreas v. McGuire, 2010 WL 1849939, at *2 (D.N.J. May 7, 2010)(citing N.J.S.A. 59:8-3; N.J.S.A. 59:8-8). Indeed, "[a] suit will be dismissed if the claimant did not provide a notice of claim to the entity within ninety days of the 'accrual of a cause of action.'" Davis v. Twp. of Paulsboro, 371 F.Supp.2d 611, 618 (D.N.J. 2005).

In this matter, Plaintiff has neither addressed the merits of Stockton's argument on this point nor claimed that she has complied with the TCA. Therefore, the Court must dismiss the personal injury claims against Stockton. Additionally, the Court notes that any effort to amend the complaint to address that issue would be futile, because Plaintiff's failure to file the mandatory notice of claim bars her from proceeding with her personal injury tort claims against Stockton.

### B. *Title IX and § 1983 Claims*

Second, the Stockton Defendants argue that Plaintiff fails to state a claim under Title IX and Section 1983. The United States Supreme Court has held that Title IX "implies a private right of action to enforce its prohibition on intentional sex discrimination." Jackson v. Birmingham Bd. of Educ., 544 U.S.

12

167, 173 (2005)(emphasis added). To that end, "retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX," because retaliation is "by definition, an intentional act." See id. at 173-174. Meanwhile, to state a claim under § 1983, Plaintiff must allege that the school purposefully discriminated against her and treated her differently than others similarly situated. See Keel v. Delaware State Univ. Bd. of Trustees, 2019 WL 494621, at *7 (D. Del. Feb. 8, 2019).

A private Title IX and § 1983 claim may also exist against a public school in cases of student-on-student harassment, but "only where the funding recipient is deliberately indifferent to sexual harassment, of which the recipient has actual knowledge, and that harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 650 (1999)(emphasis added). Indeed, damages may not be recovered unless a school official "who at a minimum has authority to institute corrective measures on the [school's] behalf has actual notice of, and is deliberately indifferent" to the alleged misconduct. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 277 (1998).

"Deliberate indifference claims impose a significant burden on the plaintiff and consequently rarely proceed beyond a motion to dismiss." Saravanan v. Drexel Univ., 2017 WL 5659821, at *7 (E.D. Pa. Nov. 24, 2017). Under Title IX, deliberate indifference requires "a response (or failure to respond) that is clearly unreasonable in light of the known circumstances." Keel, 2019 WL 494621, at *6. Furthermore, the Supreme Court has held that it would "frustrate the purposes" of Title IX to permit a damages recovery "based on principles of respondeat superior or constructive notice, i.e., without actual notice" to a school official. See Gebser, 524 U.S. at 285.

In this case, it appears that Plaintiff's Title IX and § 1983 causes of action are based on an alleged failure to further investigate the alleged sexual assaults, and take actions against PKP, the unidentified perpetrator who sexually assaulted Plaintiff, and Defendant Murphy. However, Plaintiff's Complaint states that she reported only the first sexual assault, by the "red headed male" at the PKP party. Because Plaintiff never alleges that she reported either of Defendant Murphy's alleged sexual assaults to any Stockton official, Stockton did not have "actual notice" of those assaults.

Next, as to Stockton's alleged failure to address the lone reported sexual assault, Plaintiff has not alleged that the perpetrator was a Stockton student or that Stockton had control

14

over PKP, which was operating off-campus without University recognition. Therefore, the Court cannot assume that Stockton had substantial control over either the referenced individual or PKP.

This is not to say that this Court condones Stockton's failure to provide Plaintiff with more support or further investigate her claims. However, in this instance, the Court finds that no remedy is available under Title IX and § 1983, based on the facts, as alleged, in Plaintiff's Complaint.

**C.** *Vicarious Liability (Against PKP)*

Third, PKP argues that it cannot be held liable for the tortious conduct of the unnamed perpetrator under a theory of vicarious liability or <u>respondeat superior</u>. Specifically, PKP contends that it did not owe a duty to protect Plaintiff from the alleged sexual assault that occurred at the Stockton PKP house.

"Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." <u>Hopkins v. Fox & Lazo</u>

15

Realtors, 132 N.J. 426, 439 (1993)(internal citations omitted). When conducting this analysis, [t]he foreseeability of the harm involved is one of the many considerations in assessing whether a duty is owed." Peguero v. Tau Kappa Epsilon Local Chapter, 439 N.J. Super. 77, 89 (App. Div. 2015). Additionally, foreseeability is "based on the defendant's knowledge of the risk of injury." Id.(internal citations omitted).

In Peguero, the Superior Court of New Jersey, Appellate Division, found that a fraternity was not liable for injuries sustained when a guest at a party fired a gun in the backyard of the fraternity house. In that case, the Superior Court found that it was not reasonably foreseeable that an "unknown assailant" would bring a gun to the party, drink heavily, get into an altercation, fire the handgun, and injure someone. See id. at 93. However, in dicta, the court opined that it was not suggesting that "a fraternity or its members could not be liable for criminal or other dangerous behavior that occurs during the course of a party hosted by fraternity members." Id. at 93. The Superior Court added that it was "cognizant of the tragic consequences of hazing, excessive drinking, sexual assaults, and other harmful acts that have occurred at fraternity houses or at other fraternity events." Id.

Under somewhat similar circumstances, other courts have found that national fraternities are not liable for the tortious

16

conduct of their members. Recently, the Middle District of Tennessee found that the national organization of the Pi Kappa Alpha fraternity was not liable for an alleged sexual assault by a fraternity member. Doe v. Andrew, 2017 WL 3443598, at *13-14 (M.D. Tenn. Aug. 9, 2017). In relevant part, the court stated:

> "The Court concludes Doe's injuries and the manner in which they occurred were not reasonably foreseeable so as to give rise to a special relationship with Doe. Certainly, a sexual assault at a fraternity party—or any party—is foreseeable, in the sense that it does not defy the rules of logic and common sense to think that it might happen. But foreseeability for purposes of identifying duties under tort law requires more than that. It requires at least <u>reasonable</u> foreseeability—a foreseeability built on something more than mere possibilities."
>
> ...
>
> "Here, however, there is no evidence the Chapter had notice of any sexual misconduct by any Chapter member, including Andrews. The Court agrees with the Chapter that knowledge of allegations of sexual misconduct at a few other Pi Kappa Alpha chapters was not sufficient to raise the possibility of sexual assault to such reasonable foreseeability as to give rise to a duty by the Chapter to take additional specific precautions to protect its guests, such as Doe."

Id. (emphasis in original); see also Ostrander v. Duggan, 341 F.3d 745, 749 (8th Cir.2003)(finding that the defendant fraternity had no duty to protect plaintiff from a sexual assault because the plaintiff "adduced no evidence that would cause a reasonable person to foresee injury to herself or other female visitors arising from sexual misconduct at the [fraternity] premises"); Rogers v. Sigma Chi Int'l Fraternity, 9 N.E.3d 755,

17

765 (Ind.Ct.App.2014) (granting summary judgment to the national Sigma Chi fraternity for what it deemed to be an "unforeseeable" criminal assault of a party attendee by another guest); <u>Colangelo v. Tau Kappa Epsilon Fraternity</u>, 517 N.W.2d 289, 292 (1994) (finding that "the national fraternity owed no duty to supervise the local chapter's actions for the protection of third parties" for injuries arising from a drunk driving accident).

Plaintiff argues that PKP's national organization was on constructive notice of sexually inappropriate conduct at the Stockton chapter because PKP "has a systematic problem of bad acts and underage drinking and either allows, encourages, or supports the continued bad acts of its members, associates, and associate chapters." <u>See</u> Pl.'s Opp. Br. at 9. This Court, however, cannot reach that conclusion based on the pleadings. In this case, Plaintiff's Complaint did not allege that the PKP national organization was on notice of any prior incidents involving sexual assault at the Stockton PKP fraternity house. Plaintiff has also not alleged that PKP had any specific knowledge that the unnamed "red headed male," posed a risk to sexually assault female party guests. In fact, Plaintiff does not even clearly allege that the individual was a PKP member.

In Plaintiff's Brief in Opposition to the MTD, Plaintiff alleges for the first time that call logs from the Galloway Township Police indicate 62 calls to the Stockton PKP house since

2006, with three calls for "sexual assault/attempts."  See Pl.'s Opp. Br., at 10.  However, of the three police responses to sexual assaults at the PKP house, two occurred in March 2017, one occurred in February 2018, and none resulted in criminal charges.  Although the reported incidents in March 2017, which occurred before the alleged sexual assault in this case, is potentially relevant – the February 2018 call has no bearing on foreseeability in this case, since it happened after the alleged assault.  Plaintiff's Brief in Opposition also attempts to argue foreseeability by referencing various PKP chapters around the country that lost university recognition.  See id. at 7-10.  However, of the 15 examples listed, only one, at a chapter in Florida, appears to involve a sexual assault.  Furthermore, these facts and allegations were not set forth in the Complaint and Plaintiff may not amend her Complaint through a response to a motion to dismiss.

Based on the facts alleged in the Complaint, the Court finds that dismissal of the claims against PKP is warranted for failure to state a claim under a vicarious liability theory.

**D. Remaining State Law Claims**

In light of the Court's dismissal of all Title IX and Section 1983 claims in this matter, the Court notes that only the state law personal injury-related claims against Defendant Murphy remain pending.  Unless Plaintiff is able to amend the Complaint

to sufficiently state federal claims, this Court will evaluate whether to retain supplemental jurisdiction over the remaining claims. Therefore, if Plaintiff does not file an amended complaint, Plaintiff must show cause as to why this case should not be remanded to New Jersey state court.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss will be **GRANTED** and Plaintiff's claims against the Moving Defendants will be **DISMISSED WITHOUT PREJUDICE**. Plaintiff shall be permitted thirty (30) days to either file an amended complaint that addresses the deficiencies set forth herein, to the extent possible, or show cause as to why this case should not be remanded to New Jersey State Court. An appropriate Order shall issue on this date.

DATED: July 29, 2019

                                        s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE